# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| JAMES ATHERTON, Derivatively on Behalf of FIRSTENERGY CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. DOWLING, ROBERT REFFNER, STEVEN E. STRAH, K. JON TAYLOR, JAMES F. PEARSON, EBONY YEBOAH-AMANKWAH, PAUL T. ADDISON, JERRY SUE THORNTON, WILLIAM T. COTTLE, GEORGE M. SMART, MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, DONALD T. MISHEFF, THOMAS N. MITCHELL, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, JULIA L. JOHNSON, CHARLES E. JONES, JAMES F. O'NEIL III, LUIS A. REYES, AND LESLIE M. TURNER, <br><br> Individual Defendants, <br><br> -and- <br><br> FIRSTENERGY CORPORATION, INC., an Ohio corporation, <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff James Atherton ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which

1

included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant First Energy Corporation ("FirstEnergy" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to FirstEnergy's reputation, goodwill, and standing in the business community and has exposed FirstEnergy to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged FirstEnergy in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by FirstEnergy's directors and officers from February 21, 2017 through the present (the "Relevant Period").

3.      FirstEnergy is an electric utility company involved in the supply, transmission, and production of electricity, as well as other energy-related services.

4.      FirstEnergy has two nuclear power plants in Ohio, the Perry Nuclear Generating Station (the "Perry Plant") and the Davis-Besse Nuclear Power Station (the "Davis-Besse Plant"), (the "Nuclear Power Plants").

5.      During the Relevant Period, the Individual Defendants knowingly and/or recklessly allowed the Company to boldly deal in a bribery and racketeering scandal involving Ohio House Speaker Larry Householder ("Householder") that was allegedly bankrolled in part by FirstEnergy. The truth was revealed on July 21, 2020 when Householder, along with certain

2

other individuals, were arrested and charged in a racketeering conspiracy after trading a $1 billion bailout and other favorable legislation for approximately $60 million from FirstEnergy, *USA v. Borges*, Case No. 1:20-mj-00526 (S.D. Ohio) (the "Criminal Action" or the "Criminal Complaint").

6.     The bribery scheme involved Ohio House Bill 6 which was passed in 2019 and would save FirstEnergy Solutions' ("FES"), a subsidiary of the Company, Nuclear Power Plants from closure by giving them more than $1 billion paid for through a surcharge on electric consumers starting January 1, 2021 ("HB 6"). Without HB 6, First Energy's Nuclear Power Plants would have ceased operations. The Individual Defendants caused the Company to issue statements that falsely represented that the Company was complying with state and federal laws and regulations regarding regulatory matters. This exposed the Company and its unaware investors to risks of legal and financial harm. The bribery occurred for years until the Criminal Complaint was filed on July 17, 2020 in the Ohio Southern District. Householder's arrest and charge followed soon after.

7.     The Criminal Complaint details how FirstEnergy used another company, Generation Now, a 501(c)(4) entity controlled by Householder, to funnel payments of millions of dollars to Householder.

8.     These actions have destroyed Ohioans' faith in their legislature.

9.     Five days after the Criminal Complaint was filed, July 22, 2020, First Energy's stock decreased as low as approximately 45% from its July 17, 2020 closing price.

10.    The Individual Defendants knowingly and/or recklessly allowed the Company to blatantly engage in bribery for years and failed to protect the Company and its investors from the inevitable fallout of this scheme.

3

11.     The Company has been substantially damaged as a result of the Individual Defendants' breaches of fiduciary duty and misconduct. Therefore, Plaintiff brings this action derivatively to remedy his damages.

12.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

13.     As detailed herein, and as alleged in the ongoing federal the securities class action filed against FirstEnergy, Charles E. Jones, James F. Pearson, Steven Strah and K. Jon Taylor in the United States District Court for the Southern District of Ohio, No. 2:20-cv-03785 (July 28, 2020) (the "Securities Class Action") FirstEnergy's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

4

16.    This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation incorporated in this District or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Individual Defendants have received substantial compensation in this District by engaging in various activities that had an effect in this District. Venue is proper in this District because the Company and the Individual Defendants have conducted business in this District and Individual Defendants' actions have had an effect in this District, including the dissemination of false and misleading statements. In addition, the Criminal Complaint is pending in this District, a class action complaint is pending in this District, *Owens v. FirstEnergy Corp.*, No. 2:20-cv-03785 (S.D. Ohio), and a civil litigation against the Company for the bribery scheme, *Smith v. FirstEnergy Corp., et al.*, 2:20-cv-3755 (S.D. Ohio).

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

### THE PARTIES

#### Plaintiff

19.    Plaintiff James Atherton has continuously been a stockholder of FirstEnergy during the wrongdoing complained of herein.

20.    Defendant Michael Dowling ("Dowling") is Senior Vice President, External Affairs, and member of FirstEnergy's Leadership Council. Dowling is responsible for FirstEnergy's local, state, and federal Governmental Affairs; Energy Policy; State Regulatory

5

Affairs and Market Policies; Economic Development; Corporate Affairs and Community Involvement; and the FirstEnergy Political Action Committee.

21.     Defendant Robert Reffner ("Reffner") is Senior Vice President and Chief Legal Officer, and a member of FirstEnergy's Leadership Council. Reffner is responsible for, among other things, FirstEnergy's Legal, Ethics, Risk and Internal Auditing.

22.     Defendant Steven E. Strah ("Strah") is President of FirstEnergy. He previously served as FirstEnergy's CFO from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, defendant Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He is a member of FirstEnergy's Leadership Council. Strah is a named defendant in Securities Class Actions.

23.     Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from Defendant Strah. Prior to assuming this position, he was a Vice President, Company's Controller, and Chief Accounting Officer until March 2018 when Taylor was named president of Ohio Operations. He was promoted to Vice President, FirstEnergy Utilities in April 2019, and elected to his current position in May 2020. Taylor is a named defendant in Securities Class Actions.

24.     Defendant James F. Pearson ("Pearson") served as FirstEnergy's CFO from 2013 until March 2018. From March 2018 until his April 2019 retirement, Pearson served as Vice President of Finance. Since at least 1976, he held a number of positions with the Company or its subsidiaries, including in management. Pearson is a named defendant in the Securities Class Actions.

25.     Defendant Ebony Yeboah-Amankwah ("Yeboah-Amankwah") is Vice President, General Counsel, and Chief Ethics Officer, and member of FirstEnergy's Leadership Council.

26.     Defendant Paul T. Addison ("Addison") served as a director of the Company and a member of the Board's Audit Committee from 2003 until May 21, 2019. From at least 2017 to 2018, Addison served on the Audit Committee.

27.     Defendant Jerry Sue Thornton ("Thornton") served as a director of the Company between 2015 and May 21, 2019.

28.     Defendant William T. Cottle ("Cottle") served as a director of the Company and a member of the Board's Governance Corporate Responsibility Committee until May 15, 2018.

29.     Defendant George M. Smart ("Smart") served as a director of the Company between 1997 and May 15, 2018. Smart served on the Audit Committee and the Corporate Governance and Corporate Responsibility Committees until May 15, 2018.

30.     Defendant Michael J. Anderson ("Anderson") is Chairman of First Energy's Board of Directors (the "Board"). He has been a Director of FirstEnergy since 2007 and serves on the Board's Audit Committee. From at least 2017 to 2019, Anderson served on the Corporate Governance and Corporate Responsibility Committee.

31.     Defendant Steven J. Demetriou ("Demetriou") has been a Director of FirstEnergy since 2017.

32.     Defendant Donald T. Misheff ("Misheff") has been non-executive Chairman of the FirstEnergy Board since May 2018 and Director of FirstEnergy since 2012. He also serves on the Audit and Corporate Governance and Corporate Responsibility Committees. From at least 2017 to 2019, he served on the Audit and Corporate Governance and Corporate Responsibility Committees.

33.     Defendant Thomas N. Mitchell ("Mitchell") has been a Director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility Committee.

From at least 2018 to 2019, he served on the Corporate Governance and Corporate Responsibility Committee.

34. Defendant Christopher D. Pappas ("Pappas") has been a Director of FirstEnergy since 2011.

35. Defendant Sandra Pianalto ("Pianalto") has been a Director of FirstEnergy since 2018 and serves on the Audit Committee.

36. Defendant Julia L. Johnson ("Johnson") has been a Director of First Energy since 2011 and serves on the Corporate Governance and Corporate Responsibility Committee. From at least 2017 to 2019, Johnson served on the Corporate Governance and Corporate Responsibility Committee.

37. Defendant Charles E. Jones ("Jones") has been President, CEO, and a director of First Energy since 2015. Defendant Jones sold shares with insider information regarding the Company' bribery scheme, which resulted in FirstEnergy stock trading at artificially inflated prices at the time of his stock sales. Jones is named as a named defendant in Securities Class Actions.

38. Defendant James F. O'Neil, III ("O'Neil") has been a Director of FirstEnergy since 2017. From at least 2018 to 2019, he served on the Audit Committee.

39. Defendant Luis A. Reyes ("Reyes") has been a Director of FirstEnergy since 2013. Reyes serves on the Corporate Governance and Corporate Responsibility Committee. From at least 2017 to 2019, he served on the above-mentioned Committee.

40. Defendant Leslie M. Turner ("Turner") has been a Director of FirstEnergy since 2018 and serves on the Audit Committee since 2019.

41. Defendants Addison, Thornton, Cottle, Smart, Anderson, Demetriou, Johnson,

8

Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner are referred to collectively as the "Director Defendants." Defendants Jones, Strah, Reffner, Dowling, Yeboah-Amankwah, Taylor, and Pearson are referred to collectively as the "Officer Defendants." The Director Defendants and the Officer Defendants are, collectively, the "Individual Defendants."

42.    Defendants Addison, Smart, O'Neil, Anderson, Misheff, Pianalto, and Turner were or currently are members of the Audit Committee and are referred to collectively as the "Audit Committee Defendants."

43.    Defendants Cottle, Smart, Anderson, Johnson, Misheff, Mitchell, and Reyes were or currently are members of the Corporate Governance and Corporate Responsibility Committee and are referred to collectively as the "Corporate Governance Committee Defendants."

**Nominal Defendant**

44.    Nominal Defendant FirstEnergy is an Ohio corporation headquartered at 76 South Main Street, Akron, Ohio.

## SUBSTANTIVE ALLEGATIONS

### Company Background and History of Wrongdoing

43.    FirstEnergy is a utility company, and its subsidiaries are involved in the transmission, distribution, and production of electricity. FirstEnergy's ten utility operating companies comprise one of the nation's largest investor-owned electric systems, serving over six million customers stretching from Ohio to New Jersey's coast.

44.    Prior to the Relevant Period, FirstEnergy's Nuclear Power Plants in Ohio were in financial decline due to their mismanagement. This was related to the fact that FirstEnergy had been fined a record $28 million to avoid being criminally prosecuted for lying to the government about the dangerous condition of the Davis-Besse Plant. It was later revealed that

the Company allowed boric acid to eat a football sized hole through over six inches of the carbon steel reactor head. The plant was closed to repair serious maintenance problems, forcing the Company to spend hundreds of millions on repairs, shutdown costs, and the purchase of replacement energy.

45.     At the time of the Davis-Besse Plant debacle, it was alleged in a U.S.-Canada Power System Outage Task Force Report that the massive blackout of August 14, 2003 could have been prevented and "FE failed to conduct rigorous long-term planning studies of its systems, and neglected to conduct appropriate multiple contingency or extreme condition assessments."[1]

46.     As time passed, Nuclear Power Plants' maintenance costs continued to increase for the Company. At the same time, alternatives to nuclear energy became cheaper and more appealing, such as natural gas, and FirstEnergy's service areas decreased in demand, lowering the potential revenue of the Nuclear Power Plants. Throughout the Relevant Period, the individual Defendants reassured investors that FirstEnergy was pursuing a legislative fix to turn around its deteriorating financial situation. For example, in FirstEnergy's 2016 Annual Report, filed on February 21, 2017, the Company stated that it intended to pursue "legislative or regulatory solutions" to address the problem. Likewise, FirstEnergy's CEO, defendant Jones, repeated this plan on the Company's annual earnings call held with investors the next day, stating that FirstEnergy sought "legislative or regulatory initiatives for generation that recognize its environmental or energy security benefits."

47.     While the public attempt was received favorably by investors, the Individual

---

[1] U.S.-Canada Power System Outage Task Force, "Final Report on the August 14, 2003 Blackout in the United States and Canada: Causes and Recommendations," (Apr. 2004), available at https://www.energy.gov/sites/prod/files/oeprod/DocumentsandMedia/BlackoutFinal-Web.pdf.

Defendants concealed the truth which was that the Company's "legislative solution" involved a criminal campaign to corrupt prominent state legislators in order to secure a massive ratepayer-funded bailout. Over the next two-and-a-half years, FirstEnergy would orchestrate an elaborate scheme to funnel tens of millions of dollars to state lawmakers, blanket media platforms with misleading messages, and destroy a citizens' ballot initiative.

### The Bribery Scheme

48.     In January 2017, Householder met with FirstEnergy representatives during a flight on a private FirstEnergy jet. After spending 15 years away from public office, Householder won back his old seat in 2016 and was eager to rise back to his Speakership position. During or around the time of this flight, an insidious deal was struck between Householder and the Company. FirstEnergy agreed to direct millions of dollars in payments to Householder for his own enrichment and to support his goal to become Speaker, through campaign funding. In exchange, Householder promised to secure the passage of HB 6. One of FirstEnergy's lobbyists referred to the surreptitious scheme as an "unholy alliance."

49.     In February 2017, the corrupt conspiracy between Householder and FirstEnergy went into motion with the establishment of "Generation Now" and "Energy Pass-Through," Householder controlled entities used to funnel dark money from the Company to Householder and his underlings. The next month, Householder began receiving periodic $250,000 payments, an amount that would steadily increase until it reached into the millions of dollars a month. The conspiracy used FirstEnergy as their never-ending piggy bank to corrupt the Ohio legislature and pass HB 6. In all, FirstEnergy and its affiliates paid more than $60 million to Householder and his operatives in furtherance of the bribery scheme.

50.     The day Householder was elected Speaker, he did not waste any time, pledging

11

to create a subcommittee on energy generation. Householder followed through by securing the votes for HB 6 and defending the bill against a citizens' ballot initiative. The law prevented the shutdown of FirstEnergy's two money-pit Nuclear Power Plants, granting a $9 per megawatt hour subsidy to "clean" energy generation. To pay for this generous subsidy, Ohio ratepayers would be assessed a monthly fixed charge, ratcheting up energy costs for millions of consumers. The bill benefited FirstEnergy's nuclear subsidiaries, which were projected to collect approximately 94% of the payments worth an estimated $160 million annually.

51.     At all times, Householder worked hand-in-hand with FirstEnergy and its affiliates and closely coordinated the legislative and media strategy with high-ranking Company representatives. In the short time between January 2019 and July 2019, the period when Householder became Speaker until HB 6 was signed into law, Householder called FirstEnergy CEO defendant Jones at least 30 times. Throughout the Relevant Period, Householder held at least 84 phone calls with defendant Jones, 14 phone calls with FirstEnergy's VP of External Affairs (defendant Dowling), and 188 phone calls with FirstEnergy's Director of Ohio State Affairs. This was while the bribery scheme was receiving millions of dollars from FirstEnergy and taking overt steps to put FirstEnergy's plans to corrupt the legislative process into action. Far from the work of rogue employees, the wrongdoing was directly orchestrated and overseen by Company insiders, including the Individual Defendants.

52.     The bribery scheme worked, and HB 6 was passed in July 2019. Almost immediately, public opposition began to rally, and citizen groups began work to get on the ballot, a voter referendum to repeal the law. Under Ohio rules, the ballot campaign had until October 2019 to gather approximately 265,000 signatures to block HB 6 from taking effect.

53.     FirstEnergy kicked its efforts into high gear to thwart this initiative. At least

$38 million was wired through Generation Now into a front company that paid for a media firestorm of commercials and fliers orchestrated by the illicit enterprise. These advertisements were intended to confuse and scare Ohioans by falsely claiming that China was using the petition drive to invade Ohio's energy grid.

54.     The Board at this time unequivocally knew that the Company had a cozy relationship with Householder and that FirstEnergy had engaged in multiple financial transactions involving Householder. For example, in just the first two months of 2018, FirstEnergy donated over $150,000 to candidates who backed Householder for Speaker or who are considered his allies.

55.     For a time, FirstEnergy was able to conceal its wrongdoings from the public, and the Individual Defendants' unabashed attitude towards breaking the law successfully inflated the price of FirstEnergy common stock.

### The Individual Defendants Cause the Company to Issue False and Misleading Statements During the Relevant Period

56.     The Relevant Period begins on February 21, 2017. On that date, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Smart, Cottle, Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Reyes, Pearson, Thornton, and Taylor. The 2016 10-K stated that FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2016 10-K also stated with respect to FES, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory solution." The Federal Energy Regulatory

Commission ("FERC") and the Nuclear Regulatory Commission ("NRC") makes regulations and policies FirstEnergy must comply with. The 2016 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones, and Pearson also filed signed certifications with the SEC stating that the 2016 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

57.     During the Company's fourth quarter earnings call on February 22, 2017, FirstEnergy discussed its fiscal 2016 financial results led by defendants Jones, Pearson and Taylor. During the call, defendant Jones stated:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.

> We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

58.     On April 27, 2017, July 27, 2017 and October 26, 2017, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2017, June 30, 2017 and September 30, 2017, respectively, which were signed by defendant Taylor. These documents claimed that FirstEnergy's nuclear power business continued to comply "with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." They also continued to highlight the efforts of FirstEnergy's management to secure

a regulatory or legislative fix for the problems posed by the Company's unprofitable nuclear facilities. For example, the quarterly reports stated that FirstEnergy's management was "continuing with legislative efforts to explore a regulatory solution" for FES or was "continuing . . . efforts to explore legislative or regulatory solutions" for FES. Defendants Jones and Pearson also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

59. On February 20, 2018, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"), which was signed by defendants Smart, Addison, Cottle, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Pearson, Thornton, and Taylor. The 2017 10-K stated that FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2017 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson also filed signed certifications with the SEC stating that the 2017 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

60. On February 21, 2018, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2017 financial results led by defendants Jones, Pearson and Taylor. During the call, defendant Jones stated that FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but he was disappointed that those efforts had not yet resulted in "meaningful legislative or regulatory

support" for the Company's nuclear facilities. He stated that FES would "continue to look at all options regarding these units, and we will continue to support policy solutions."

61.     On April 23, 2018, July 31, 2018 and October 25, 2018, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2018, June 30, 2018 and September 30, 2018, respectively. Generally Accepted Accounting Principles ("GAAP") are a collection of commonly-followed accounting rules and standards for financial reporting. The Public Utilities Commission of Ohio ("PUCO") regulates a wide variety of public utilities including electricity, natural gas, pipelines, heating, and cooling. The Pennsylvania Public Utility Commission ("PPUC") regulates utilities in Pennsylvania including electric. The Maryland Public Service Commission ("MDPSC") is an independent administrative agency within the state government which regulates public utilities in Maryland. The New York State Public Service Commission ("NYPSC") is the public utilities commission of the New York state government that regulates and oversees the electric, gas, water, and telecommunication industries in New York. The Public Service Commission of West Virginia ("WVPSC") is the Public Utilities Commission of the State of West Virginia. The Virginia State Corporation Commission ("VSCC") is a Virginia regulatory agency whose authority encompasses utilities. The New Jersey Board of Public Utilities ("NJBPU") regulates statewide utilities for New Jersey. These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and

16

were free from fraud.

62.     On February 19, 2019, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by defendants Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Turner, Thornton and Strah. The 2018 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2018 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

63.     On February 20, 2019, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2018 financial results led by defendants Jones and Strah. In response to an analyst's question about whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, defendant Jones responded:

> Not in any specific form, Julien. Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input. But it's too early in the process for me to talk about what that might mean.

64.     On April 23, 2019, July 23, 2019 and November 4, 2019, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2019, June 30, 2019 and September 30, 2019. These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices

prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

65.     On February 10, 2020, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), which was signed by defendants Jones, Strah, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner. The 2019 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2019 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

66.     On April 23, 2020, FirstEnergy filed with the SEC its quarterly report on Form 10-Q for the quarter ending March 31, 2020. The quarterly report claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly report did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

18

67.     The statements above referenced in the Company's quarterly and annual filings were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by the Individual Defendants:

a.  that FirstEnergy and its representatives and affiliates had orchestrated a $60 million campaign to corrupt the political process in order to secure the passage of legislation favoring the Company and its affiliates;

b.  that FirstEnergy and its representatives and affiliates had secretly funneled tens of millions of dollars to bribe Ohio politicians in order to secure votes in favor of HB 6, a $1.3 billion ratepayer bailout for FirstEnergy's unprofitable nuclear facilities;

c.  that FirstEnergy and its representatives and affiliates had conducted a massive, misleading advertising campaign in support of HB 6 and in opposition to a ballot initiative to repeal HB 6 by passing millions of dollars through an intricate web of dark money entities and front companies in order to conceal the Company's involvement;

d.  that FirstEnergy and its representatives and affiliates had subverted a citizens' ballot initiative to repeal HB 6 by, among other unscrupulous tactics, hiring signature gathering firms to conflict them out of working with the ballot initiative and bribing ballot initiative insiders and signature collectors;

e.  that, as a result of (a)-(d) above, the statements made during the Relevant Period regarding FirstEnergy's regulatory and legislative efforts were materially false and misleading; and

f.  that, as a result of (a)-(e) above, FirstEnergy was subject to an extreme, undisclosed

risk of reputational, legal, and financial harm.

68.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii)

("Item 303") required the Company's quarterly and annual financial reports issued during the

Relevant Period to "[d]escribe any known trends or uncertainties that have had or that the

registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

revenues or income from continuing operations." The Individual Defendants' failure to disclose

FirstEnergy's involvement in the massive bribery and corruption scheme detailed herein violated

Item 303 because these activities represented known trends and uncertainties that were likely to

have a material unfavorable impact on the Company's business and financial results.

**THE TRUTH IS REVEALED**

69.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio

issued a press release stating in part:

> **Ohio House Speaker, former chair of Ohio Republican Party, 3 other
> individuals & 501(c)(4) entity charged in federal public corruption
> racketeering conspiracy involving $60 million**
>
> . . . The Ohio Speaker of the House was arrested this morning and charged in a
> federal racketeering conspiracy involving approximately $60 million paid to a
> 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout.
> It is alleged that **Larry Householder**, 61, of Glenford, Ohio, and the enterprise
> conspired to violate the racketeering statute through honest services wire fraud,
> receipt of millions of dollars in bribes and money laundering.
>
> Four other individuals were also arrested and charged. They include:
>
> - **Mathew Borges**, 48, of Bexley, a lobbyist who previously served as chair of
>   the Ohio Republican Party;
>
> - **Jeffrey Longstreth**, 44, of Columbus, Householder's longtime campaign
>   and political strategist;
>
> - **Neil Clark**, 67, of Columbus, a lobbyist who owns and operates Grant
>   Street Consultants and previously served as budget director for the Ohio

Republican Caucus; and

- **Juan Cespedes**, 40, of Columbus, a multi-client lobbyist.

**Generation Now**, a corporate entity registered as a 501(c)(4) social welfare organization, was also charged.

The five individual defendants had initial appearances via video conference at 1pm today, at which time the case was unsealed.

According to the 80-page criminal complaint unsealed today, from March 2017 to March 2020, the enterprise received millions of dollars in exchange for Householder's and the enterprise's help in passing House Bill 6, a billion-dollar bailout that saved two failing, Ohio nuclear power plants from closing.

The defendants then also allegedly worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative to overturn the legislation. The Enterprise received approximately $60 million into Generation Now from an energy company and its affiliates during the relevant period.

As alleged, in February 2017, Longstreth incorporated Generation Now as a 501(c)(4) social welfare entity purporting to promote energy independence and economic development; however, the entity was secretly controlled by Householder. As Clark stated in a recorded conversation, "*Generation Now is the Speaker's (c)(4)*." Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

In March 2017, Householder began receiving quarterly $250,000 payments from the related-energy companies into the bank account of Generation Now. The defendants allegedly spent millions of the company's dollars to support Householder's political bid to become Speaker, to support House candidates they believed would back Householder, and for their own personal benefit. When asked how much money was in Generation Now, Clark said, "*it's unlimited.*"

The affidavit filed in support of the criminal complaint also alleges:

- In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election. The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

- Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

- Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

- The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

The racketeering conspiracy as charged in this case is punishable by up to 20 years in prison.

"It takes courage for citizens to assist law enforcement in the ways detailed in the affidavit," U.S. Attorney David M. DeVillers said. "We are grateful to those who felt a moral duty to work together with agents in bringing to light this alleged, significant public corruption."

"All forms of public corruption are unacceptable," stated FBI Cincinnati Special Agent in Charge Chris Hoffman. "When the corruption is alleged to reach some of the highest levels of our state government, the citizens of Ohio should be shocked and appalled."

70.     An 81-page criminal complaint and affidavit was filed that same day in the Criminal Action. Documents filed in the Criminal Action detail a brazen scheme by FirstEnergy to corrupt the political process and undermine democratic institutions in the State of Ohio in order to secure passage of HB 6. Detailed transcripts of phone calls, recorded conversations, text messages, bank records and contemporaneous documentary evidence support the allegations contained in the Criminal Action's complaint.

71.     In reaction to the news the Company stated, "[t]his afternoon, FirstEnergy received subpoenas in connection with the investigation surrounding Ohio House Bill 6. We are reviewing the details of the investigation and we intend to fully cooperate."

72.     It is impossible that the Board had no knowledge regarding the bribery scheme

alleged herein. The Individual Defendants' knowledge and/or reckless disregard for the Company's improper conduct is demonstrated by the stunning breadth and magnitude of the alleged activities, which involved the largest money-laundering and bribery scheme in Ohio history. *Tens of millions of dollars* were transferred from FirstEnergy bank accounts through various dark money accounts in order to secure, one of the Company's top legislative priorities. In fact, the bailouts made up about 50% of Energy Harbor's, a subsidiary of FirstEnergy, free cash flow, according to analysts at the financial research firm, CreditSights.

73.     On July 22, 2020, *Cleveland.com* published an article entitled, "FirstEnergy was relentless in quest to have Ohio legislature bail out the utility's nuclear plants," which provided the following additional details regarding the Company's illicit activities:

> FirstEnergy Corp. tried and failed more than once to convince state lawmakers to subsidize the company's two Ohio nuclear power plants, but was unable to achieve its goal until Larry Householder became speaker of the Ohio House of Representatives in 2019.
>
> As speaker, Householder wasted little time pushing through House Bill 6, legislation that included the $1 billion nuclear plant bailout at the center of racketeering charges leveled against Householder and four others on Tuesday.
>
> Householder is accused of heading up a criminal enterprise dating back to early 2017 that took in $60 million from FirstEnergy to put Householder and his supporters in power and to ram the bailout legislation through the General Assembly.
>
> House Bill 6 was imminently important to FirstEnergy. It culminated years of work by the struggling FirstEnergy-based utility to get out from under crushing debt. But with the federal charges Tuesday surrounding the lobbying effort behind the bailout, some organizations are already calling for its repeal.
>
> "Ohio House Bill 6 was an ugly corporate bailout from the beginning, and it hasn't gotten any prettier," the conservative Buckeye Institute, a Columbus-based think tank, stated on Tuesday. "The Buckeye Institute calls upon policymakers to rectify the previous error and take decisive action to move the state forward and away from subsidizing crony companies while sticking ordinary Ohioans with higher energy bills."

**Early calls for help**

FirstEnergy let it be known as far back as 2016 that it wanted relief for Perry nuclear plant in Lake County and Davis-Besse nuclear plant east of Toledo.

During an annual energy conference in early 2017, Rep. Bill Seitz, a Cincinnati Republican, revealed that First Energy was in "substantial financial trouble." First Energy proposed something called "zero emission credits," which would allow the utility to charge extra on electric bills because it was generating carbon-free nuclear power.

The credits would allow FirstEnergy to collect $300 million a year in perpetuity.

Bills that would have created the Zero-Emissions Nuclear Resource (ZENR) Program were introduced in the House and Senate in April 2017 and they drew plenty of testimony.

The bill "would enable Ohio to take control of a critical component of its energy future by ensuring our nuclear plants are compensated for the many benefits they provide," then First Energy CEO Charles Jones said in a statement to the House Public Utilities Committee.

**A legislative failure**

Testifying before the same committee, Ned Hill, a professor in the John Glenn College of Public Affairs at Ohio State University, referred to FirstEnergy financial engineering as "fanciful."

"The Committee members have heard that energy markets are complex. And the Committee has been presented with a complex, Rube Goldberg- like financial instrument," Hill testified. "My advice to you: Protect your constituents' wallets whenever an issue is advertised as being complex, and the person offering testimony does not try to provide clarity and simplicity."

The House bill and the companion Senate bill never made it out of the committee. Changes were made and a new bill was introduced in the House in October of 2017, but it too languished in committee.

The Ohio Consumers' Counsel and the Ohio Manufacturers' Association were among those who opposed idea as did then-House Speaker Cliff Rosenberger.

**A new plan of attack**

24

FirstEnergy wasn't about to give up. In March of 2018, First Energy announced plans to get out of the nuclear power business within three years by closing Davis-Besse in 2020, and the Perry and Beaver Valley plant near Pittsburgh in 2021.

Shortly after the announcement, FirstEnergy Solutions Corp, which was the nuclear division of First Energy, filed for bankruptcy protection. It now operates under the name Energy Harbor.

The company set about lobbying the state legislature for the nuclear subsidies it had failed to obtain. That strategy, according to the federal prosecutors, included funneling millions of dollars to an organization, Generation Now, controlled by Householder.

Householder used some of that money to position himself to become the next speaker. After Rosenberger resigned in April amid a scandal of his own, Rep. Ryan Smith, another bailout opponent, assumed the speaker's job. But Householder courted a number of Democrats and built a coalition to win the power struggle.

### Approving the bailout

The push for House Bill 6 took off in earnest. After the bill was introduced, First Energy stepped up payments to Generation Now, which paid for mailings and media advertisements to pressure lawmakers into supporting the bill.

The utility financed Ohio Clean Energy Jobs Alliance, which included mayors, school officials, labor unions an economic development officials, to promote the idea of saving the nuclear plants and the jobs they provided.

What was missing was any concrete explanation from FirstEnergy of why it needed the bailout. The company never provided specifics about the plant's profitability, but it didn't matter.

In July 2019, only six months into Householder's term as speaker, HB 6 passed 51-38 and cleared the Ohio Senate. Gov. Mike DeWine did not hesitate to sign it into law.

### Tapping customers for cash

The bill was a huge boost to FirstEnergy as it required every residential electricity customer in Ohio to pay a monthly surcharge of 85 cents and for large industrial plants to pay an additional $2,400 a month, starting in 2021 and extending through 2027.

It also called for an additional monthly fee to subsidize coal plants in Ohio and

Indiana, while eliminating state-imposed mandates on energy efficiency and renewable energy. Trish Demeter, chief of staff at the Ohio Environmental Council Fund, believes merging the three – the nuclear bailout, the coal subsidies and the rolled-back mandates – helped secure the bill's passage.

For example, it gave the ideologically minded legislator opposed to mandates a reason to vote for it, Demeter said.

With the three issues aligned and the strong-armed tactics employed by Householder and his crew, "it's not surprising that it got through with all of this money and interest fueling that pressure to get it done," Demeter said.

### A failed referendum

It was a crushing blow to consumer watchdogs and to renewable energy advocates who quickly mounted a drive to overturn the law by referendum only to be met by fierce opposition.

The same forces that conspired to get the bill enacted, moved against the opposition.

TV and radio ads alleged that signing the petition to overturn HB 6 "equated with ceding control of Ohio energy to China," according to federal prosecutors. Workers attempting to get signatures were accosted while doing their job.

The petition drive failed to gain the required number of signatures to be placed on the ballot.

### A boost for investors

As a final kick in the teeth to the opposition, critics allege proceeds from the increased rates didn't go to bailout the plants but to bolster the share price of the investors who acquired the nuclear plants.

FirstEnergy Solutions, which owned the two Northern Ohio nuclear plants, emerged from bankruptcy in February as Energy Harbor Corp.

Then in May, the board of Energy Harbor agreed to buy back $300 million in stock – on top of the $500 million it had previously approved, thus driving up its share price and allowing investors to cash out their shares – immediately fueling suspicions that enriching shareholders had been the reason for HB 6 all along.

Ned Hill, the Ohio State professor who opposed the bailout, wasn't surprised.

26

"This was an act of socialism, where you socialize the risk and privatize the benefits," Hill said. "So it's no big surprise they're now going to make sure their investors get a return from their investment in the political process. They won, so they get their cash."

74.     The price of FirstEnergy stock plummeted on this news, falling to a low of just $22.85 per share on July 22, 2020, approximately 45% below the stock's closing price days prior, on abnormally high trading volume.

## THE FALSE AND MISLEADING PROXY STATEMENTS

### The 2017 Proxy

75.     On March 31, 2017, defendants Addison, Anderson, Cottle, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, Smart, and Thornton, reviewed, approved, and caused the Company to file a Proxy Statement (the "2017 Proxy" or "2017 Annual Proxy").

76.     In the 2017 Annual Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of the Directors; and (2) to approve the Company's executive compensation.

77.     With respect to Risk Management, the 2017 Proxy stated:

Board's Role in Risk Oversight

Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board

committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

78.     With respect to the role of the Directors on the Company's Audit Committee with respect to Risk Management, the 2017 Proxy stated:

> Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, the full Board considers applicable risks of your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy. In addition, while your Company's Chief Risk Officer administratively reports to the Chief Financial Officer (later referred to as your CFO), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

79.     The 2017 Proxy also stated the following:

> Codes of Business Conduct
> Your Company's Code of Business Conduct applies to all employees, including the CEO, CFO, and Chief Accounting Officer. In addition, your Board has a separate Director Code of Ethics and Business Conduct.

80.     The above statements conveyed that the Board (a) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address flaws in FirstEnergy's regulatory compliance; and (b) was unaware of existing material risks that could affect the Company.

81.     The 2017 Proxy omitted any disclosures regarding the massive bribery scheme the Company was engaged in. The Board, at the time they approved the 2017 Proxy, had

28

knowledge of the Company's unlawful bribery scheme, which put the Company at material risk, and wrongfully failed to disclose this information to shareholders.

82. The 2017 Proxy harmed FirstEnergy by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a result of the false or misleading statements in the 2018 Proxy, FirstEnergy stockholders voted to re-elect defendants Anderson, Addison, Cottle, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Reyes, Thornton, and Smart to the Board.

83. The 2017 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2017 Proxy said:

> The primary objectives of your Company's executive compensation program are to attract, motivate, retain, and reward the talented executives who we believe can provide the performance and leadership we need to achieve success in the highly complex energy industry. Our executive compensation program is centered on a pay-for-performance philosophy and is aligned with the long-term interests of our shareholders. In 2016, compensation adjustments were provided to some of our NEOs, positioning the total annual compensation opportunities provided to our NEOs, in the aggregate, at 4 percent above the average of the revenue-regressed 50th percentile of our peer group of utility and general industry companies.

84. Those statements in the 2017 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system encouraged improper behavior. Defendants Anderson, Addison, Cottle, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Reyes, Thornton, and Smart knew that executives had allowed the Company to partake in the bribery scheme, while exposing the Company to significant and material risks and liability through their conduct.

85.     These assurances in the 2017 Proxy that the Company had adequate systems of oversight regarding risks to the Company were utterly false and misleading, because they omitted to state that the Company was partaking in the bribery scheme, exposing the Company to significant and material risks and liability through such conduct. While the Board suggested to investors it would update its website to inform investors of such material information, during the Relevant Period, no such disclosures were made.

86.     As a result of the false and misleading statements in the 2018 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2018 Proxy on May 15, 2018. Had the FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program on an advisory basis.

87.     Furthermore, the 2017 Proxy included a shareholder proposal requiring an annual report disclosing the lobbying policies and payments (the "2017 Lobbying Proposal"). Propounded by The Nathan Cummings Foundation, the 2017 Lobbying Proposal noted that "full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders." The Nathan Cummings Foundation further noted that the Company did not choose to disclose its lobbying payouts, whereas the Company disclosed its federal lobbying payouts exceeded $4 million in 2014 and 2015. The silence on state lobbying posed a "reputational risk." In a prescient note, the Nathan Cummings Foundation remarked that "absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." As a result, the 2017 Lobbying Proposal asked that the Company prepare

annual reports disclosing:

> 1.     Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.

> 2.     Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.

> 3.     FirstEnergy's membership in and payments to any tax- exempt organization that writes and endorses model legislation.

> 4.     A description of the decision-making process and oversight by management and the Board for making payments described in sections 2 and 3 above.

88.     The report was to be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

89.     Defendants Anderson, Addison, Cottle, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Reyes, Thornton, and Smart reacted by using a shareholder vote. They recommended that shareholders vote against the 2017 Lobbying Proposal, and instead rely on the existing disclosure framework, under which many state lobbying efforts could remain undisclosed to the public. That lack of disclosure helped conceal the amounts FirstEnergy was paying and would continue to pay Householder.

**The 2018 Proxy**

90.     On March 30, 2018, Defendants Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, and Thornton, reviewed, approved, and caused the Company to file a Proxy Statement (the "2018 Proxy" or "2018 Annual Proxy").

91.     The 2018 Proxy was signed by Yeboah-Amankwah, FirstEnergy Vice President, Corporate Secretary, & Chief Ethics Officer.

31

92. In the 2018 Annual Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of the Directors; and (2) to approve the Company's executive compensation.

93. With respect to Risk Management, the 2018 Proxy stated:

Board's Role in Risk Oversight

Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

94. With respect to the role of the Directors on the Company's Audit Committee with respect to Risk Management, the 2018 Proxy stated:

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, the full Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy. In addition, while your Company's Chief Risk Officer administratively reports to your Chief Financial Officer (your "CFO"), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

95.     The 2018 Proxy also stated the following:

Codes of Business Conduct
Your Company's Code of Business Conduct applies to all employees, including
the CEO, CFO, and Chief Accounting Officer. In addition, your Board has a
separate Director Code of Ethics and Business Conduct.

96.     The above statements conveyed that the Board (a) maintained sufficient

compliance, risk controls, review, and reporting programs to identify and address flaws in

FirstEnergy's regulatory compliance; and (b) was unaware of existing material risks that could

affect the Company.

97.     The 2018 Proxy omitted any disclosures regarding the massive bribery scheme

the Company was engaged in. The Board, at the time they approved the 2018 Proxy, had

knowledge of the Company's unlawful bribery scheme, which put the Company at material risk,

and wrongfully failed to disclose this information to shareholders.

98.     The 2018 Proxy harmed FirstEnergy by interfering with its shareholders' right

to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a

result of the false or misleading statements in the 2018 Proxy, FirstEnergy stockholders voted to

re-elect Defendants Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil,

Pappas, Pianalto, Reyes, and Thornton to the Board.

99.     The 2018 Proxy also urged stockholders to approve an advisory resolution

regarding compensation paid to named executives. In support of the requested approval, in

addition to the statements quoted above, the 2018 Proxy said:

The primary objectives of your Company's executive compensation program
are to attract, motivate, retain, and reward the talented executives, including the
NEOs, who we believe can provide the performance and leadership to achieve
success in the highly complex energy industry. Our executive compensation
program is centered on a pay-for-performance philosophy.

33

100.     Those statements in the 2018 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system encouraged improper behavior. Defendants Anderson, Addison, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Thorton knew that executives had allowed the Company to partake in the bribery scheme, while exposing the Company to significant and material risks and liability through their conduct.

101.     Lastly, and importantly, the 2018 Proxy stated that the Board had adequate oversight function over FirstEnergy's lobbying activities:

> Outreach and Engagement Program Shareholder Feedback
>
> Based on the results of our Outreach and Engagement efforts, your Board has taken the following steps:
>
> ***
>
> Enhanced Board Oversight of Lobbying Activities and Related Disclosures: Although it did not pass, in response to the vote received on the 2017 lobbying activities shareholder proposal, we elicited shareholder feedback on the Company's current practices and disclosures concerning our lobbying activities. Most of those engaged shareholders indicated little or no concern with our current disclosures; however, some investors suggested that we include more specific information about the Corporate Governance Committee's oversight role of our lobbying activities. Accordingly, in 2017, your Board further strengthened its oversight of your Company's lobbying activities and amended the Corporate Governance Committee's Charter to clarify this responsibility. The Corporate Governance Committee maintains an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations. We also regularly evaluate our related disclosures and anticipate updating these disclosures on our website.

102.     These assurances in the 2018 Proxy that the Company had adequate systems of oversight regarding political lobbying and disclosures of its practices regarding such activity

were utterly false and misleading, because they omitted to state that the Company was partaking in the bribery scheme, to strengthen the outcomes of its political lobbying, while exposing the Company to significant and material risks and liability through such conduct. While the Board suggested to investors it would update its website to inform investors of such material information, during the Relevant Period, no such disclosures were made.

103.     As a result of the false and misleading statements in the 2018 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2018 Proxy on May 15, 2018. Had the FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program on an advisory basis.

### The 2019 Proxy

104.     On April 1, 2019, defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner reviewed, approved, and caused the Company to file a Proxy Statement (the "2019 Proxy" or "2019 Annual Proxy").

105.     The 2019 Proxy was signed by Yeboah-Amankwah, FirstEnergy Vice President, Deputy General Counsel, Corporate Secretary, & Chief Ethics Officer.

106.     In the 2019 Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of the Directors; and (2) to approve the Company's executive compensation.

107.     With respect to Risk Management, the 2019 Proxy stated:

> **Board Oversight**
>
> *Risk Management*
> Your Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall

35

success of your Company. Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A management Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

108.    With respect to the role of the Directors on the Company's Audit Committee

with respect to Risk Management, the 2019 Proxy stated:

Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, your Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review your Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy. In addition, while your Company's Chief Risk Officer administratively reports to your Chief Financial Officer (your "CFO"), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

The 2019 Proxy also stated the following:

*Codes of Business Conduct*
Your Company's Code of Business Conduct applies to all employees, including the CEO, CFO, and Chief Accounting

> Officer. In addition, your Board has a separate Director Code of
> Ethics and Business Conduct.

109.    The above statements conveyed that the Board (a) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address flaws in FirstEnergy's regulatory compliance; and (b) was unaware of existing material risks that could affect the Company.

110.    The 2019 Proxy omitted any disclosures regarding the massive bribery scheme the Company was engaged in. The Board at the time they approved the 2018 Proxy, had knowledge of the Company's unlawful bribery scheme, which put the Company at material risk, and wrongfully failed to disclose this information to shareholders.

111.    On May 21, 2019, FirstEnergy's shareholders voted to approve each of the proposals in the 2019 Proxy.

112.    The 2019 Proxy harmed FirstEnergy by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a result of the false or misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

113.    The 2019 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2019 Proxy said:

> The primary objectives of your Company's executive compensation program
> are to attract, motivate, retain, and reward the talented executives, including the
> NEOs, who we believe can provide the performance and leadership to achieve
> success in the highly complex energy industry. Our executive compensation
> program is centered on a pay-for-performance philosophy.

114.     Those statements in the 2019 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system encouraged and rewarded illegal behavior. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner knew that executives had deliberately omitted and/or ignored the bribery scheme, when communicating with investors, while exposing the Company to significant and material risks and liability through their conduct.

115.     The 2019 Annual Proxy also stated that the Board had adequate oversight processes for political contributions:

> *Public Policy and Engagement*
> We have a decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance, Sustainability and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations. Based on feedback from our shareholder engagement and outreach, we recently expanded our website disclosure to include reports on federal and state level lobbying, as well as, the lobbying portion of certain trade association dues.

116.     These assurances in the 2019 Proxy that the Company had adequate systems of oversight regarding political contributions and disclosures of its practices regarding such activity were utterly false and misleading, because they omitted to state that the Company was partaking in the bribery scheme, to strengthen the outcomes of its political lobbying, while exposing the Company to significant and material risks and liability through such conduct. While the Board suggested to investors it would update its website to inform investors of such material information, during the Relevant Period, no such disclosures were made.

117.    As a result of the false and misleading statements in the 2019 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2019 Proxy. Had the FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program.

**The 2020 Proxy**

118.    On April 1, 2020, defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner reviewed, approved, and caused the Company to file a Proxy Statement (the "2020 Proxy" or "2020 Annual Proxy").

119.    The 2020 Proxy was signed by Yeboah-Amankwah, FirstEnergy Vice President, Deputy General Counsel, Corporate Secretary, & Chief Ethics Officer.

120.    In the 2020 Proxy, the Board sought shareholder approval for, *inter alia*: (1) the re-election of the Directors; (2) to approve the Company's executive compensation on an advisory basis; and (3) FirstEnergy's 2020 Incentive Compensation Plan (the "Plan").

121.    With respect to Risk Management, the 2020 Proxy stated:

**Board Oversight**

*Risk Management*
The Company faces a variety of risks and recognizes that the effective management of those risks contributes to the overall success of the Company. The Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks. A management Risk Policy Committee, consisting of the Vice President, Risk & Internal Audit (who serves as our Chief Risk Officer) and senior executive officers, provides oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels. Other management committees exist to address topical risk issues. Timely reports on significant risk issues are provided as appropriate to employees, management, senior executive officers, respective Board committees, and the full Board. The Chief Risk Officer also prepares

enterprise-wide risk management reports that are presented to the Audit Committee, the Finance Committee and your Board.

122.     With respect to the role of the Directors on the Company's Audit Committee with respect to Risk Management, the 2020 Proxy stated:

> Your Board administers its risk oversight function through the full Board, as well as through the various Board committees. Specifically, your Board considers risks applicable to the Company at each meeting in connection with its consideration of significant business and financial developments of the Company. Also, the Audit Committee Charter requires the Audit Committee to oversee, assess, discuss, and generally review the Company's policies with respect to the assessment and management of risks, including risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity. The Audit Committee also reviews and discusses with management the steps taken to monitor, control, and mitigate such exposures. Through this oversight process, your Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in the Company's strategy. In addition, while the Company's Chief Risk Officer administratively reports to your Chief Financial Officer (your "CFO"), he also has full access to the Audit Committee and Finance Committee and is scheduled to attend each of their committee meetings.

123.     The 2020 Proxy also stated:

> *Codes of Business Conduct*
> The Company's Code of Business Conduct applies to all Company personnel, including the CEO, CFO and Chief Accounting Officer. In addition, your Board has implemented a separate Board of Directors Code of Ethics and Business Conduct.

124.     The above statements conveyed that the Board (a) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in FirstEnergy's regulatory compliance; and (b) was unaware of existing material risks that could affect the Company.

125.     The 2020 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in

addition to the statements quoted above, the 2020 Proxy said:

> The primary objectives of the Company's executive compensation program are to attract, motivate, retain, and reward the talented executives, including the NEOs, who we believe can provide the performance and leadership to achieve success in the highly complex energy industry. Our executive compensation program is centered on a pay-for-performance philosophy.

126. The 2020 Annual Proxy also requested shareholders to vote to approve the FirstEnergy's Plan, stating:

> The purpose of the Plan is to promote the success of your Company and its subsidiaries by providing incentives to certain employees and directors that are expected to help link their personal interests to the long-term financial success of your Company and its subsidiaries and to help increase shareholder value. By adopting the Plan, your Board believes your Company will continue to be able to attract, motivate and retain the employees and directors whose judgment, interest, efforts, and special skills will help enable your Company to succeed.

> \*\*\*

> Your Company believes its future success depends in part on its ability to attract, motivate, and retain high quality employees and directors and that the ability to provide equity-based and incentive-based awards under the Plan is critical to achieving this success. Your Company would be at a severe competitive disadvantage if it could not use share-based awards to recruit and compensate its employees and directors. The use of common stock as part of your Company's compensation program is also important because equity-based awards are an essential component of its compensation program for certain employees, as they help link compensation with long-term shareholder value creation and reward participants based on service and/or performance.

127. The 2020 Annual Proxy also stated that the Board had adequate oversight processes in place for political contributions:

> *Public Policy and Engagement*
> We have decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance and Corporate Responsibility Committee periodically reviews this policy and

related practices as well as dues and/or contributions to industry groups and trade associations. Based on feedback from our shareholder engagement and outreach, we expanded our website disclosure to include reports on federal and state level lobbying, as well as, the lobbying portion of certain trade association dues.

128.     These assurances in the 2020 Proxy that the Company had adequate systems of oversight regarding political contributions and disclosures of its practices regarding such activity were utterly false and misleading, because they omitted to state that the Company was partaking in the bribery scheme, to strengthen the outcomes of its political lobbying, while exposing the Company to significant and material risks and liability through such conduct. While the Board suggested to investors it would update its website to inform investors of such material information, during the Relevant Period, no such disclosures were made.

129.     On May 19, 2020, FirstEnergy's shareholders voted to approve each of the proposals in the 2020 Proxy.

130.     The 2020 Proxy harmed FirstEnergy by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting FirstEnergy. As a result of the false or misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

131.     Those statements in the 2020 Annual Proxy conveyed the impression that FirstEnergy's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, FirstEnergy's compensation system encouraged and rewarded illegal behavior. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner knew that executives had breached their fiduciary duties to the Company by ignoring the bribery scheme while exposing

the Company to significant and material risks and liability through their conduct.

132. As a result of the false and misleading statements in the 2020 Proxy, FirstEnergy's stockholders voted to approve the proposals in the 2020 Proxy. Had the FirstEnergy shareholders been fully informed about the true operations at FirstEnergy, including the massive and pervasive bribery scheme, they would not have voted to re-elect the directors, would not have voted to approve the Company's executive compensation program, and would not have voted for the Plan.

## FIDUCIARY DUTIES

133. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe FirstEnergy and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage FirstEnergy in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of FirstEnergy and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

134. Each Individual Defendant owes and continues to owe FirstEnergy, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

135. The Individual Defendants, because of their positions of control and authority as directors and/or officers of FirstEnergy, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with FirstEnergy, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors

of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

136.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b.    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c.    remain informed as to how FirstEnergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d.    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

137.    The Individual Defendants, as officers and/or directors of FirstEnergy, were bound by the Company's Code of Business Conduct[2] (the "Code of Conduct") which required the following:

> **GUIDING PRINCIPLES OF BUSINESS CONDUCT**
> It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct and ongoing dialogue.
>
> **RELATIONSHIPS WITH OTHERS**
>
> *Fair Dealing* - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, **bribes**, kickbacks, **illegal payments**, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor.
>
> ***
>
> *Corporate Opportunities* - Personnel owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. Corporate opportunities relating to the kinds of products and services we usually sell or the activities we typically pursue that arise during the course of your work or through the use of our property or information belong to the Company. Similarly, other corporate opportunities that fit into our strategic plans or satisfy our commercial objectives that arise under similar conditions also belong to the Company. You may not take personal advantage of any business or investment opportunity that you may learn about through your work for the Company and that the Company may want to pursue – unless and until the Company has had

---

[2] See FirstEnergy Code of Business Conduct:
https://www.firstenergycorp.com/content/dam/investor/files/policies-charters/code-of-business-conduct.pdf

an opportunity to evaluate it and has chosen not to pursue it.

\*\*\*

*Protection of Corporate Assets, Including Corporate Funds* - We have a responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes.

\*\*\*

*Corporate Records* - Information derived from our records is provided to our shareholders and investors as well as government agencies. Ensure you accurately record all financial transactions in a timely manner in accordance with prescribed accounting principles. Make full, fair, accurate, timely and understandable disclosure of financial and nonfinancial information as required by law and regulation, including reports we file with the Securities and Exchange Commission (the "SEC") and other public communications. Never knowingly record false or misleading information on any Company record, report, or document, including those reports and documents submitted to any government agency, including but not limited to the SEC. Falsifying records or keeping unrecorded funds and assets is a severe offense and may result in prosecution or termination.

Corporate records, regardless of format, should be retained or discarded in accordance with our record retention policies and all applicable laws and regulations.

\*\*\*

*Compliance with the Law* - Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications from your immediate supervisor or the Legal Department. **Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law**, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

138. In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, the Audit Committee Defendants, owed specific duties to

FirstEnergy under the Audit Committee Charter[3] (the "Audit charter"). Specifically, the Audit

Charter provided for the following responsibilities of the Audit Committee Defendants to:

> To assist the Board with oversight of:
> (a) The integrity of the Company's financial statements;
> (b) The Company's compliance with legal, risk management and
> regulatory requirements;
> (c) The independent auditor's qualifications and independence;
> (d) The performance of the Company's internal audit function and
> independent auditor; and
> (e) The Company's systems of internal control with respect to the
> accuracy of financial records, adherence to Company policies
> and compliance with legal and regulatory requirements.

***

> The Committee's function is one of oversight, recognizing that the Company's
> management is responsible for preparing the Company's financial statements,
> and the independent auditor is responsible for auditing those statements. In
> adopting this Charter, the Board acknowledges that the Committee members are
> not employees of the Company and are not providing any expert or special
> assurance as to the Company's financial statements or any professional
> certification as to the independent auditor's work or auditing standards. Each
> member of the Committee shall be entitled to rely on the integrity of those
> persons and organizations within and outside the Company that provide
> information to the Committee and the accuracy and completeness of the
> financial and other information provided to the Committee by such persons or
> organizations absent actual knowledge to the contrary.

***

> The Committee, as a whole or through the Chair, shall review and
> discuss with management, the internal auditor, and the independent auditor
> prior to filing the Company's Reports on Forms 10-K or 10-Q, any major issues
> regarding accounting principles and financial statement presentation, including
> the impact on the financial statements of significant events, transactions or
> changes in the Company's selection or application of accounting principles or
> estimates that potentially affect the quality of the financial reporting, major
> issues as to the adequacy of the Company's internal controls and any special
> audit steps adopted in light of material control deficiencies and the adequacy of
> disclosures about changes in internal control over financial reporting.

---

[3] See FirstEnergy Audit Committee Charter at:
https://www.firstenergycorp.com/content/dam/investor/files/policies-charters/board-charters/Audit-Charter.pdf

The Committee shall review and discuss with management and the independent auditor, management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K.

The Committee shall review disclosures made to the Committee by the Company's chief executive officer and chief financial officer during their certification process for Forms 10-K and Forms 10-Q regarding any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

\*\*\*

Although the Committee shall not be required to pre-approve or discuss in advance each earnings release or each instance in which the Company may provide earnings guidance, the Committee shall review and discuss with management press releases related to the Company's earnings, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to financial analysts and rating agencies.

\*\*\*

The Committee shall periodically review with the Chief Audit Officer the adequacy of the Company's internal controls and corporate compliance structures, including computerized information system controls and security, to reasonably determine, at a minimum, that: (a) components of the Company's internal control and corporate compliance structures are regularly evaluated; (b) such evaluations are performed by qualified personnel; and (c) such evaluations have reasonable scope and depth of coverage and are conducted with sufficient frequency. The Committee shall discuss with the independent auditors any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit, in addition to reviewing with the independent auditor the Company's compliance with the requirements of the Sarbanes-Oxley Act of 2002, as may be amended from time to time.

\*\*\*

Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and

regulations, and shall review the record keeping and reporting systems to measure and monitor regulatory compliance requirements. In general, the Committee shall also periodically review the Company's policies and procedures regarding compliance with the Company's Code of Business Conduct and the Company's Conflicts-of-Interest Policy, and methods for disseminating information regarding the foregoing policies. The Committee shall review corrective actions taken by the Company when significant internal or corporate compliance problems are reported. If the Committee becomes aware of any significant deficiency from corporate compliance programs or internal control programs, or of material violations of established corporate policies or legal and regulatory requirements, it shall: (a) reasonably determine that all appropriate corrective actions have been taken in response thereto, and that such actions are sufficient under the circumstances; (b) review any management override (which shall include waivers permitted by policies or procedures) of corporate compliance programs and internal control programs, and take the steps necessary to reasonably determine that such action or override will not occur in the future without Board approval; and (c) review the process for reporting deficiencies or violations to reasonably assure that the Chief Audit Officer and the Chief Ethics Officer are informed of such deficiencies or violations.

139. The Audit Committee Defendants failed to follow these procedures and policies resulting in a breach of their duties to investors.

140. Finally, the Company's Corporate Governance Committee under the Corporate Governance and Corporate Responsibility Charter[4] (the "Corporate Governance Charter") under its charter had the following responsibility:

The Committee shall periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations.

141. The Individual Defendants failed to maintain their duties laid out by the Company's Code of Conduct, Audit Charter, and Corporate Governance Charter.

**BREACHES OF DUTIES**

142. The conduct of the Individual Defendants complained of herein involves a

---

[4] See FirstEnergy Corporate Governance and Corporate Responsibility Charter at:
https://www.firstenergycorp.com/content/dam/investor/files/policies-charters/board-charters/Corp-Gov-Charter.pdf

knowing and culpable violation of their obligations as officers and/or directors of FirstEnergy, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

143. The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems and risks the Company was encountering. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make false statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused FirstEnergy substantial damage.

144. The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee FirstEnergy's public statements and internal control function.

145. The Corporate Governance Committee had a duty to review the Company's political participation and contributions.

146. The Individual Defendants, because of their positions of control and authority as officers and/or directors of FirstEnergy, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, FirstEnergy has expended, and will continue to expend, significant sums of money.

**DAMAGES TO FIRSTENERGY**

147.   The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

        a.        Possible restatements and goodwill impairments;

        b.        Liability arising from the Securities Class Action;

        c.        The loss of credibility with customers and suppliers; and

        d.        Legal and accounting costs associated with litigation, investigations, and restatements.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

148.   Plaintiff brings this action derivatively and for the benefit of FirstEnergy to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of FirstEnergy, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

149.   FirstEnergy is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150.   Plaintiff is, and has been continuously at all relevant times, a stockholder of FirstEnergy. Plaintiff will adequately and fairly represent the interests of FirstEnergy in enforcing and prosecuting their rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

151.   Plaintiff incorporates by reference and re-allege each allegation stated above as if fully set forth herein.

152.   A pre-suit demand on the Board of FirstEnergy is futile and, therefore, excused. At the time of filing of this action, the Board consists of Individual Defendants Anderson,

Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner. Plaintiff need only to allege demand futility as a majority of the Directors who are on the Board at the time this action is commenced. In this case, all the current Directors are Individual Defendants.

153.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the scheme and decide whether to pursue action against themselves and the other perpetrators of the scheme.

154.    The exorbitant size of the illegal political contributions, $60 million, could not have been made without the Director Defendants' knowledge and approval, or their conscious disregard to properly oversee these transactions, which was their stated responsibility in the 2017, 2018, 2019, and 2020 Proxies ("the Proxies").

155.    In light of the breaches of fiduciary duties engaged in by the Defendants, most of whom are the Company's current directors, their participation in the wrongful conduct complained of herein, the substantial likelihood of the directors' liability in this derivative action, liability in the Securities Class Action filed against FirstEnergy, Charles E. Jones, James F. Pearson, Steven Strah and K. Jon Taylor, their being beholden to each other, their longstanding business and personal relationships with each other, and their being neither disinterested nor independent, a majority of FirstEnergy's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company, and thus demand is excused as futile.

156.    Furthermore, Directors Misheff and Pappas serve together on the Trinseo S.A. board of Directors. Misheff has been a director since February 2015 and Pappas has been a director since October 2010. Pappas was Trinseo's President and CEO from June 2010 through March 2019 and is currently a Special Adviser to Trinseo's President and CEO. Directors Misheff and Demetriou served together on the Aleris Corporation board of directors. Misheff served as a director from 2015 through 2018. Demetriou served as Chairman and CEO from 2004 through 2015.

157.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme which allowed the omission of disclosure of the extensive bribery scheme being engaged in by the Company, was intended to attract investors. The Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused. The Company has suffered and continues to suffer due to the Director Defendants' actions.

158.    Moreover, several of the Directors acted to ensure that the Company's disclosures will lack important information regarding the Company's lobbying efforts, which would have revealed the illegal conduct. In March 2017, defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, Pappas, and Reyes voted against a shareholder proposal which sought transparency and accountability on lobbying policies and payments. Had that proposal gone through, the bribery scheme would have been disclosed to shareholders. The prior two years, Defendants Anderson, Johnson, Jones, Misheff, Pappas, and Reyes had also successfully recommended that shareholders vote against substantially similar proposals.

159.    During the Relevant Period, the Company's Board has supported Company's unlawful payments to state public officials, through its recommendations to vote against shareholder proposals to increase lobbying transparency. Furthermore, in 2017, just months after the bribery scheme started, a majority of the current Board recommended that shareholders vote against a proposal that would have required disclosure of the illegal payments. The Board, in the face of knowledge and notice that payments to state officials by the Company required monitoring and disclosure, rejected an effort to shed sunlight on the Company's dealings. Therefore, demand on the current Board to take action in response to the illegal payments would be futile.

160.    Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

161.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of

Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

162.    FirstEnergy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FirstEnergy any part of the damages FirstEnergy suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

163.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

164.    The acts complained of herein constitute violations of fiduciary duties owed by FirstEnergy's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

165.    The Directors may also be protected against personal liability for their acts of

mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of FirstEnergy. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Individual Defendants were to sue themselves or certain officers of FirstEnergy, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

166.    If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause FirstEnergy to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

167.    Thus, for all the reasons set forth above, all of the Director Individual Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

168. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

170. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

171. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

172. The Proxies stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of

Conduct. The Proxies were also false and misleading because, despite assertions to the contrary, FirstEnergy's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

173. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

174. The false and misleading elements of the annual Proxy led to the re-elections of all the Director Individual Defendants, allowing them to continue breaching their fiduciary duties to FirstEnergy.

175. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies

176. Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

177. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178. The Individual Defendants, by virtue of their positions with FirstEnergy and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of FirstEnergy and officers and directors who made the false and misleading statements alleged herein within

the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause FirstEnergy to engage in the illegal conduct and practices complained of herein.

179.   Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

180.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of FirstEnergy's business and affairs.

182.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of FirstEnergy.

184.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

185.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

186.   Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the

Relevant Period, that assured investors that FirstEnergy was on track to flourish, yet failed to disclose the giant red flags showing the Company's involvement in the Ohio bribery scandal.

187. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

188. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

189. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

190.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.     Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

193.     Plaintiff incorporate by references and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.     By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of FirstEnergy.

195.     The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from FirstEnergy tied to the performance or artificially inflated valuation of FirstEnergy, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

196.     Plaintiff, as a stockholder and representative of FirstEnergy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

197.     Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and FirstEnergy will lose financing from investors and business from future customers who no longer trust the Company and its products.

200.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

201.    Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## PRAYER FOR RELIEF

202.        **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of FirstEnergy, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to FirstEnergy;

C.    Determining and awarding to FirstEnergy the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing FirstEnergy and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to

comply with applicable laws and protect FirstEnergy and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)      A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2)      A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)      Awarding FirstEnergy restitution from Individual Defendants;

4)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just and proper.

Dated: October 26, 2020

Respectfully submitted,

**CUMMINS LAW  LLC**
*/s/ James R. Cummins*
James R. Cummins (OH 0000861)
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202
T. 513.721.9000
F. 513.721.9001
jcummins@cumminslaw.us

*Attorneys for Plaintiff*

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com

*Attorneys for Plaintiff James Atherton*

**VERIFICATION**

I, James Atherton, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: James Atherton                    Date: 10/26/2020